Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/15/2016 09:06 AM CDT

State of Nebraska, appellee, v.
Brody L. Duncan, appellant.
___ N.W.2d ___

Filed July 15, 2016.    No. S-15-763.

1. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.
2. **Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Those matters are for the finder of fact.
3. **Criminal Law: Statutes: Appeal and Error.** It is a fundamental principle of statutory construction that courts strictly construe penal statutes, and it is not for the courts to supply missing words or sentences to make clear that which is indefinite, or to supply that which is not there.
4. **Statutes: Intent.** In construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose.
5. **Theft: Value of Goods.** Whether amounts are taken pursuant to one scheme or course of conduct is relevant not to whether the defendant is guilty of the underlying theft offense, but solely to whether the values of multiple stolen items can be aggregated for purposes of grading the offense.

6. **Theft: Value of Goods: Proof.** Although Neb. Rev. Stat. § 28-518(8) (Cum. Supp. 2014) requires some value to be proved as an element of a theft offense, the statutory language does not require proof of a particular threshold value.

7. **Theft: Value of Goods: Words and Phrases.** A finding of "one scheme or course of conduct" is not an essential element of the offense of theft, even when the State is attempting to aggregate amounts pursuant to Neb. Rev. Stat. § 28-518(7) (Cum. Supp. 2014).

Appeal from the District Court for Seward County: JAMES C. STECKER, Judge. Affirmed.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, STACY, and KELCH, JJ.

KELCH, J.

## NATURE OF CASE

Brody L. Duncan was accused of unlawfully taking two items belonging to Hymark Towing (Hymark), a Chevrolet Tahoe and a combine trailer. Rather than being charged with two Class IV felonies (theft by unlawful taking, more than $500 but less than $1,500), Duncan was charged with one Class III felony (theft by unlawful taking, more than $1,500) under the theory that the values of the Tahoe and the combine trailer could be aggregated, pursuant to Neb. Rev. Stat. § 28-518(7) (Cum. Supp. 2014), because they were "pursuant to one scheme or course of conduct." The jury found Duncan guilty of unlawfully taking both items, but made a special finding that the items were not taken pursuant to one scheme or course of conduct. On the jury's verdict, the district court found that Duncan was guilty of a Class IV felony (theft by unlawful taking, more than $500 but less than $1,500). Duncan appeals. We affirm.

### FACTS

Monte Stava owned and operated Hymark, a full-service lockout and towing business. As part of the business, Monte sometimes sold unclaimed vehicles in satisfaction of towing and storage debts pursuant to Neb. Rev. Stat. § 60-2404 (Reissue 2010). In order to sell the vehicles, Hymark had to obtain titles to the abandoned vehicles, which could be done through a sheriff's office.

Monte battled cancer for about 8 years before he passed away in November 2011. Before his death, there were times when Monte was extremely ill and his friends and relatives "pitched in" to help run the business. One of those friends was Duncan.

After Monte passed away, Duncan began handling the day-to-day operations. Monte's widow, Kasey Stava, decided to try to continue Hymark. Kasey's mother had been acting as the bookkeeper for Hymark prior to Monte's death, and after Monte's death, she wanted to set up a payroll account. She contacted Duncan and asked him what he would need moving forward. The parties agreed that Duncan would make $500 per week, plus $200 per "crush load."

The parties dispute whether Hymark was behind on paying Duncan for the work he performed before Monte's death. The bookkeeper testified that prior to Monte's death, none of the people assisting Monte received a regular salary. Hymark's checking account reflects that Duncan was paid $400, $500, and $4,000 in February, June, and December 2011, respectively, but there was no evidence as to the amount of work Duncan was performing during those times.

In February 2013, the parties had a falling out, and either Duncan quit Hymark or his employment was terminated. In March or April, Kasey sold Hymark to a new owner.

### Tahoe

Duncan claims that in exchange for his help at Hymark, Monte gave him a heavily damaged Tahoe that had been

towed and stored on Hymark's lot. At Duncan's trial on the theft charge, there was evidence that Monte liked to barter with people and trade favors, and, as explained below, two witnesses testified that Monte told them he intended to give Duncan the Tahoe. However, the only evidence that Monte actually did give Duncan the Tahoe was Duncan's statements to others that he did.

Larry Payne was a friend of Monte's, and at all relevant times, he owned a shop out of his home in Seward, Nebraska, where he worked on cars as a hobby. At Duncan's trial, Payne testified that Duncan called Payne about 6 months after Monte died and wanted Payne to pull the motor out of the Tahoe so that Duncan could put the motor into a demolition derby car. Rather than pulling the motor out of the Tahoe, Payne offered to buy a motor and an "intake" for Duncan's demolition derby car if Duncan would let Payne keep the Tahoe. Duncan agreed.

Payne testified that when Duncan showed up with the Tahoe, Payne asked Duncan, "'This Tahoe is yours, right?' . . . 'Monte gave it to you?'" Duncan said, "'Yes.'" Payne testified that he had guessed that Monte had given the Tahoe to Duncan because of a prior conversation Payne had with Monte.

The conversation in question allegedly occurred sometime in late spring or early summer 2010. Payne testified that Monte had called Payne and asked Payne if he would come look at some vehicles in Monte's lot to see if they were worth listing on the Internet. Payne explained that he would sometimes list Monte's vehicles on the Internet for him. Payne testified that he and Monte walked around the lot looking at the vehicles. They approached the Tahoe, and Payne asked Monte, "'What's the deal on this one?'" Payne testified that Monte said, "'I'm saving it for [Duncan].'"

On redirect, Payne admitted that after the exchange with Duncan, he had sent text messages to Duncan asking Duncan what Kasey wanted for the Tahoe and offered $500 to $700. On recross, Payne testified that this was because he was

trying to "help settle the estate" and make amends. Payne explained:

> [T]he estate wasn't settled because of that vehicle . . . . I just — I had no idea that anybody was mad at me for anything that I had done. I was just trying to make [amends.] I just thought if it was a matter of money, I would give her what she wanted to make her happy with the vehicle.

In February 2013, to get a title to the Tahoe for Payne, Duncan submitted an application for an abandoned title to the Seward County Sheriff's Department. At the same time, he also submitted applications for other vehicles on behalf of Hymark. Duncan paid for all of the application processing fees with a Hymark check. The officer processing those applications had frequently processed abandoned title applications for Hymark. So when he noticed Duncan's name on the Tahoe's application, he became concerned. When he confronted Duncan about it, Duncan told him that Monte and Kasey had given him the Tahoe. The officer asked Duncan to have Kasey contact him to confirm this, and Duncan indicated that he would.

Two days later, a person called the officer in reference to the Tahoe. She identified herself as Kasey and stated that yes, she had given the Tahoe to Duncan. But the officer was familiar with Kasey's voice and did not recognize the voice on the telephone. He decided to call Kasey's home. The officer got in contact with Kasey and asked her if she had called him earlier. She indicated that she had not. As a result of the conversation, the officer did not issue the title to Duncan.

After Duncan had failed to provide Payne with a title for over a year, Payne asked Duncan for the telephone number of the attorney handling Monte's estate, who was also a friend of Monte's prior to his death, so that Payne could try to make some progress on the title himself.

After Payne called the attorney handling the estate, the attorney checked the estate's inventory for the Tahoe but did

not see it listed and did not remember coming across it when conducting the inventory in the winter and spring of 2012. The attorney then asked Kasey if she knew anything about the Tahoe, and Kasey stated that she had reported it as stolen. Sometime later, the attorney told Payne that the Tahoe had been listed as stolen. Payne responded that the Tahoe was not stolen—that Monte had given it to Duncan and that it was at Payne's house.

A search warrant was executed, and an investigator seized the Tahoe from Payne's property in October 2013. Approximately 2 days later, Duncan called the investigator, wanting to explain the circumstances surrounding the Tahoe. Duncan met with and was interviewed by the investigator on January 16, 2014. The interview was recorded, and a portion of it was published to the jury.

During the interview, Duncan told the investigator that Monte had given him the Tahoe in exchange for work that Duncan had done for Hymark. He said that this kind of transaction was common with Monte: "If he couldn't pay me, he found a way that . . . would help me out." Duncan explained that at the time Monte gave him the Tahoe, Duncan had a Chevrolet pickup on which the Tahoe's parts would fit. Duncan said that the Tahoe sat on Hymark's lot until July 2012, when he needed a motor for his demolition derby car and called Payne to have him remove the motor from the Tahoe.

Duncan told the investigator that when he gave Payne the Tahoe, he assumed Hymark had the title to it, but that he later found out that Hymark did not. Duncan said he then submitted the application for the title himself, along with the titles for Hymark. Duncan told the investigator that when he later called about the Tahoe's title, the officer processing his application told him that the title could not be issued to Duncan. Duncan said that he did not understand what the problem was and gave up on the title.

The investigator told Duncan that somebody called the officer, but that it was not Kasey. Duncan responded, "Okay,"

and then stated that he did not know who else it would have been.

### PROCEEDS OF COMBINE TRAILER

The investigator also asked Duncan about a combine trailer that Monte had bought at an auction. Duncan told the investigator that he had sold it for Hymark and kept the proceeds. Duncan said that Hymark was behind on paying him for the first year he worked and that Kasey's mother, the bookkeeper, told Duncan that he should keep the proceeds as payment for his services.

The purchaser of the trailer testified that in December 2011, he negotiated with Kasey for the trailer and agreed to pay $1,250. The purchaser testified that he wrote the check and gave it to Duncan, but that he did not fill in the payee line of the check because he did not know how to spell Kasey's name. When the purchaser received his bank statement, he noticed Duncan's name on the payee line of the check, but he testified that this did not disturb him, "[b]ecause Monte and [Duncan] were friends and worked together all their life[,] and . . . more than likely [Duncan] was owed labor or owed something so they just did it that way."

The bookkeeper testified that she did not tell Duncan that he could sell the combine trailer to make up for his salary. Kasey also testified that she never gave Duncan permission to sell the trailer and take the proceeds.

### DUNCAN'S TRIAL

After the State rested its case, Duncan moved to dismiss the charge, arguing that no reasonable juror could find Duncan guilty beyond a reasonable doubt of the charge set forth in the information. Although Duncan conceded there was sufficient evidence that, if believed, created a jury question on whether Duncan had unlawfully taken the proceeds of the combine trailer, he argued:

> [I]f this [theft of the Tahoe] count stood on its own, there would be insufficient evidence for the Court to send

this count to the jury and the case would be dismissed. However, since we can't really dismiss something that isn't a count, my request would be that the Court rule that this issue does not go to the jury.

The court overruled Duncan's motion.

The jury reached its verdict the day after the conclusion of the evidence. The jury found that Duncan stole the Tahoe, which the jury valued at $750, and the check, which the jury valued at $1,250. The jury also found that the Tahoe and the check were not taken pursuant to one scheme or course of conduct. Because the value of the check and that of the Tahoe could not be aggregated, the judge found Duncan guilty of unlawful taking, more than $500 but less than $1,500, a Class IV felony. On June 26, 2015, Duncan filed a motion for a new trial, which was denied. Duncan was sentenced to 4 years of probation. He timely appeals.

## ASSIGNMENTS OF ERROR

Duncan assigns that the trial court erred (1) in instructing the jury on the elements of the offense and the effect of its finding on the element of "one scheme or course of conduct" under § 28-518(7), (2) in failing to find Duncan not guilty based upon the jury's finding that the thefts were not part of one scheme or course of conduct, and (3) in failing to grant a new trial based upon the jury verdict. He also assigns that (4) the evidence was insufficient to support the verdict on the theft of the Tahoe and (5) he was prejudiced by the improper joinder for trial of two unrelated offenses.

## STANDARD OF REVIEW

[1] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[1]

---

[1] *State v. Mendoza-Bautista*, 291 Neb. 876, 869 N.W.2d 339 (2015); *State v. Ramirez*, 285 Neb. 203, 825 N.W.2d 801 (2013); *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

[2] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Those matters are for the finder of fact.[2]

## ANALYSIS

The primary issue in this case is whether a finding that the amounts were "taken pursuant to one scheme or course of conduct" is an essential element of the crime of theft when a defendant is charged with one theft offense involving multiple items pursuant to § 28-518(7). Duncan argues that it is, that the district court erred in failing to instruct the jury that it is, and that the district court erred in finding Duncan guilty of theft on the jury's verdict. We conclude that such a finding is not an essential element of the crime of theft, regardless of whether the State is attempting to aggregate amounts pursuant to § 28-518(7), but is instead relevant for purposes of grading the offense. We therefore affirm Duncan's conviction of theft by unlawful taking, a Class IV felony.

The information charged Duncan with one count of "Theft By Unlawful Taking More Than $1,500," "Class III Felony," pursuant to § 28-518 and Neb. Rev. Stat. § 28-511 (Reissue 2008).

Section 28-511(1) states that "[a] person is guilty of theft if he or she takes, or exercises control over, movable property of another with the intent to deprive him or her thereof." The grading of theft crimes is governed by § 28-518, which provides, in relevant part:

---

[2] *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

(1) Theft constitutes a Class III felony when the value of the thing involved is over one thousand five hundred dollars.

(2) Theft constitutes a Class IV felony when the value of the thing involved is five hundred dollars or more, but not over one thousand five hundred dollars.

. . . .

(7) Amounts taken pursuant to one scheme or course of conduct from one or more persons may be aggregated in the indictment or information in determining the classification of the offense, except that amounts may not be aggregated into more than one offense.

(8) In any prosecution for theft under sections 28-509 to 28-518, value shall be an essential element of the offense that must be proved beyond a reasonable doubt.

[3,4] It is a fundamental principle of statutory construction that courts strictly construe penal statutes, and it is not for the courts to supply missing words or sentences to make clear that which is indefinite, or to supply that which is not there.[3] In construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose.[4]

[5] Whether amounts are taken pursuant to one scheme or course of conduct is relevant not to whether the defendant is guilty of the underlying theft offense, but solely to whether the values of multiple stolen items can be aggregated for purposes of grading the offense.[5] This is supported by the statutory language, as well as our case law. Section 28-518

---

[3] *State v. Thacker*, 286 Neb. 16, 834 N.W.2d 597 (2013).

[4] *State v. Norman*, 282 Neb. 990, 808 N.W.2d 48 (2012).

[5] See § 28-518(7) and *State v. Gartner*, 263 Neb. 153, 638 N.W.2d 849 (2002).

grades the degree of theft according the value of the property stolen. Under § 28-518(7), an act of theft involving multiple items of property constitutes one offense if the items were taken "pursuant to one scheme or course of conduct."[6] With such an offense, § 28-518(7) provides that the value of the individual stolen items may be considered collectively for the explicit purpose of "determining the classification of the offense."[7] If the Legislature had intended to make a finding of "one scheme or course of conduct"[8] an essential element of the crime of theft, we believe it would have done so explicitly, just as it explicitly made "value" an essential element of the crime of theft in the very next subsection.[9]

[6] We have previously explained that although § 28-518(8) requires some value to be proved as an element of a theft offense, the statutory language does not require proof of a particular threshold value.[10] Accordingly, when the jury here determined the values of the check and the Tahoe, the value element set forth in § 28-518(8) was satisfied. Although those values could not be aggregated pursuant to § 28-518(7), Duncan is no less guilty of theft. Instead, he is guilty of a lesser degree of theft.

We conclude that the district court was correct in determining, based on the jury verdict, that Duncan was guilty of a Class IV felony theft offense. We note that this disposition is not unlike the disposition of the charges in *State v. Garza*,[11] which was upheld after the 1992 amendments to § 28-518.[12] In *Garza*, the defendant was convicted of theft by shoplifting

---

[6] See *State v. Miner*, 273 Neb. 837, 733 N.W.2d 891 (2007).

[7] See *State v. Garza*, 241 Neb. 256, 487 N.W.2d 551 (1992).

[8] See § 28-518(7).

[9] See § 28-518(8).

[10] See § 28-518 and *State v. Gartner, supra* note 5.

[11] *State v. Garza, supra* note 7.

[12] *State v. Gartner, supra* note 5.

as a Class IV felony. This court found that there was insufficient evidence of the value of the stolen property to justify a finding of theft punishable as a felony. We concluded, however, that the evidence showed beyond a reasonable doubt that the property stolen had some intrinsic value, notwithstanding the absence of evidence establishing a specific value. We thus set aside the felony sentence and remanded the matter to the district court with direction to impose an appropriate sentence for theft as a Class II misdemeanor. Here, the judge similarly imposed an appropriate sentence according to the jury's verdict and the value of the items stolen. The value of the check ($1,250) and the value of the Tahoe ($750) both fell within the Class IV felony range ($500 to $1,500). Had the values of these items been aggregated, Duncan would have been guilty of a Class III felony (more than $1,500). However, the judge properly found that Duncan was guilty of a Class IV felony and sentenced him accordingly.

Duncan argues that the jury's finding that there was no "one scheme or course of conduct" under § 28-518(7) requires a finding of not guilty. He argues that "if the state seeks to implicate the penalty provisions of § 28-518(7), [the subsection allowing aggregation,] it must assume the risk if it fails to prove the 'one scheme' element."[13] Otherwise, Duncan says, "the net result is the defendant faces trial on two unrelated offenses that could not otherwise have been properly joined for trial" under Neb. Rev. Stat. § 29-2002 (Reissue 2008).[14]

Section 29-2002 provides, in relevant part:

(1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or

---

[13] Brief for appellant at 17.

[14] *Id.*

on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

. . . .

(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

We note that § 29-2002 does not apply here because Duncan was not charged with two or more offenses within the same information; instead, Duncan was charged with committing one offense, a theft involving multiple items of property.

Duncan argues that the same potential for prejudice exists whether a defendant is charged with multiple offenses within the same information pursuant to § 29-2002 or charged with one theft offense involving multiple items pursuant to § 28-518(7). Duncan's concern appears to be that by aggregating the thefts of multiple items into one offense pursuant to § 28-518(7), rather than charging the thefts as separate counts within the same information pursuant to § 29-2002, the State can effectively avoid § 29-2002(3), which allows a court to order separate trials for separate counts if it appears that the defendant or the State would be prejudiced by the joinder. Duncan argues that although a defendant charged with multiple offenses could have filed a motion to sever, there is nothing he could have done to challenge the State's choice to plead the theft of the two items as a single offense.

Indeed, we have said that the right to sever is statutory,[15] and nothing in § 28-518(7) allows a court to sever a single offense into multiple counts. However, we are not convinced

---

[15] *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

that the absence of such a provision within § 28-518 shows any intent by the Legislature that a finding of "one scheme" under § 28-518(7) is to be interpreted as an essential element of the offense.

Duncan's argument about prejudice seems to contemplate a situation where the State has alleged, without a good faith basis, that acts of theft were committed pursuant to "one scheme or course of conduct" as contemplated by § 28-518(7). However, we note that if the jury determines that the acts of theft were *not* pursuant to one scheme or course of conduct, the values of the stolen items cannot be aggregated and the State is limited to one conviction of a lesser degree than it charged. In such a case, the State will have forgone obtaining multiple convictions for the separate acts of theft.

Here, the State took a risk when it alleged that Duncan was guilty of one offense involving two items, rather than two offenses. Had the State charged Duncan with two offenses, the jury verdict suggests that Duncan would have been found guilty of two Class IV felonies. But because the State chose to charge him with one offense, he was convicted of only one.

[7] Because we conclude that a finding of "one scheme or course of conduct" is not an essential element of the offense, even when the State is attempting to aggregate amounts pursuant to § 28-518(7), a number of Duncan's assignments of error are without merit. The trial court did not err in failing to instruct the jury that "one scheme or course of conduct" is an element of the offense under § 28-518(7), because it is not. The trial court also did not err in finding Duncan guilty of the Class IV felony offense or in refusing to grant Duncan's request for a new trial, notwithstanding the jury's finding that the takings of the Tahoe and the check were not pursuant to one scheme or course of conduct.

The only remaining assignment of error is Duncan's assignment that the evidence was insufficient to support the jury's verdict on the theft of the Tahoe. However, Duncan specifically stated in his brief that he "does not challenge the

sufficiency of the evidence to support the jury verdict regarding [his] conversion of the proceeds from the sale of the combine trailer."[16]

We conclude that there was sufficient evidence to support Duncan's conviction, because even without the evidence relating to the Tahoe, any rational trier of fact could have found the essential elements of the crime of theft beyond a reasonable doubt. Duncan does not challenge the jury's finding that he was guilty of theft by unlawful taking of the check. Nor does he challenge the jury's valuation of the check at $1,250. These findings support Duncan's conviction of theft by unlawful taking, more than $500 but less than $1,500, a Class IV felony. Therefore, Duncan's last assignment of error is without merit.

## CONCLUSION

We conclude that a finding of "one scheme or course of conduct" is not an essential element of the crime of theft, regardless of whether the State is attempting to aggregate amounts pursuant to § 28-518(7). We also conclude that there was sufficient evidence to support Duncan's conviction of the Class IV felony theft offense. We therefore affirm.

AFFIRMED.

---

[16] Brief for appellant at 22.